| ___ FILED | ___ LODGED |
| ___ RECEIVED | ___ COPY |

FEB 1 1 2014

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# SEALED

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-14-00191-PHX-DGC (DKD) |
| Plaintiff, | **INDICTMENT** |
| v. | VIO: 22 U.S.C. § 2778(c), 22 C.F.R. §§ 126.1, 127.2 and 127.3 (Violation of the Arms Export) Counts 1 and 3 |
| 1. Marc Turi; and | |
| 2. Turi Defense Group, | |
| Defendants. | VIO: 18 U.S.C. § 1001(a)(3) (Submitting a False Document to a Government Agency) Counts 2 and 4 |

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times material to this Indictment:

1.     Between February and July 2011, the defendant, MARC TURI, individually and through his company, TURI DEFENSE GROUP, attempted to broker a substantial quantity of weapons - machine guns, sniper rifles, assault rifles, anti-tank rockets, rockets, and other high explosives and ammunition - to individuals in Libya, with knowledge that such activities were prohibited by United States law enacted to protect the national security and the foreign policy interests of the United States.  After having been denied a brokering license to supply weapons to Libya, MARC TURI, and TURI DEFENSE GROUP then did submit brokering applications to the U.S. Department of State, Directorate of Defense Trade Controls, falsely listing Qatar and United Arab Emirates as the end users for weapons that were actually intended for individuals in

1  Libya.

2  **LIBYA**

3  2.      In February of 2011, nationwide violence erupted in Libya following the Libyan

4  government's suppression of protests against Libya's then leader Colonel Mu'ammar

5  Qadhafi in Benghazi, Libya.  A political and military movement soon followed in Libya

6  with the goal of overthrowing Colonel Qadhafi.  That movement spurred the formation of

7  a coalition of rebel groups - headquartered in Benghazi - that would later officially be

8  known as the Transitional National Council ("TNC"), or the National Transitional

9  Council ("NTC") (hereinafter "TNC").

10  3.      The armed conflict between the TNC and Qadhafi forces caused the deterioration

11  in the security of Libya, posed an immediate risk to the stability of the Libyan state, and

12  posed an even greater risk to civilian safety.  Indeed, Qadhafi forces had taken extreme

13  measures against the people of Libya, including the unrestrained use of weapons of war,

14  mercenaries, and violence against unarmed civilians.

15  4.      Facing the immediate prospect of a Qadhafi lead attempt to slaughter rebel forces

16  in Benghazi that would likely result in massive civilian casualties, the United Nations

17  ("U.N.") passed Security Council Resolution 1970 on February 26, 2011.  Resolution

18  1970: (1) imposed an arms embargo and others arms restrictions on all U.N. member

19  states; (2) imposed targeted sanctions on key regime figures; and (3) provided for civilian

20  humanitarian assistance.  On March 18, 2011, in an effort to halt the extreme violence

21  that had escalated in Libya, the United Nations passed Security Council Resolution 1973.

22  Resolution 1973 passed on March 18, 2011 and specifically: (1) authorized member

23  states to take all necessary measures to protect civilians; (2) imposed a no fly zone; (3)

24  authorized U.N. member states to take all necessary measure to enforce the arms

25  embargo; (4) provided for freezing assets of Libyan authorities; (5) imposed aviation

26  restriction; (6) imposed targeted sanction on more regime figures; and (7) established a

27  U.N. panel of experts to improve sanctions implementation.

28

5.      As a matter of United States foreign policy, "No brokering activities or brokering proposal may be carried out with respect to countries which are subject to United Nations Security Council arms embargo." See 22 C.F.R. § 29.5(d).

**ARMS EXPORT CONTROL ACT**

6.      In furtherance of the security and foreign policy of the United States, the Arms Export Control Act ("AECA") (Title 22, United States Code, Section 2778) authorized the President of the United States to control the export of defense articles by designating those items which shall be considered as defense articles, by promulgating regulations for the import and export of such articles and services, and by imposing certain licensing requirements consistent with those regulations.   The specific regulations governed by the AECA are set forth in the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Chapter 1, Subchapter M, Parts 120 - 130.

7.      The defense articles which are subject to such licensing requirements are designated on the United States Munitions List ("USML").   Those designations are made by the United States Department of State ("Department of State") with concurrence of the United States Department of Defense ("Department of Defense").   22 U.S.C. § 2778(a)(1);   22 C.F.R. § 120.2. 13. The following items are defense articles covered by the USML (22 C.F.R. § 121.1) and are listed below by description and category:

| Description | Category |
| --- | --- |
| RPK (machine gun) | I(a) |
| AKM (assault rifle) | I(a) |
| PKM (machine gun) | I(a) |
| DSHK (heavy machine gun) | I(a) |
| SVD Sniper (sniper rifle) | I(a) |
| Dragunov (sniper rifle) | I(a) |
| KPV (heavy machine gun) | I(a) |
| M46 B 130mm Towed Howitzer (long range artillery) | II(a) |

- 3 -

| | |
|---|---|
| 1 | Konkraus Launcher SPG 9 (recoilless rifle) | II(a) |
| 2 | Zu 23 Twin (double-barreled anti-aircraft cannon) | II(a) |
| 3 | 60 mm (mortar) | II(a) |
| 4 | 82 mm (mortar) | II(a) |
| 5 | 120 mm (mortar) | II(a) |
| 6 | RPG 7 (anti-tank rocket propelled grenade launcher) | IV(b) |
| 7 | SPG 9 (high explosive anti-tank rocket) | IV(b) |

8.    In addition, the following ammunition are defense articles covered by the USML (22 C.F.R. Section 121.1) and all fall into either category II(a) or III(a):

**Description**

| | |
|---|---|
| 7.62 x 39mm | (assault rifle ammunition) |
| 12.7 x 108mm | (sniper rifle ammunition) |
| 14.5 x 114mm | (heavy machine gun ammunition) |
| 23 x 152mm | (anti-aircraft ammunition) |
| 7.62 x 54Rmm | (sniper rifle ammunition) |
| 122mm Grad BM21 | (unguided rocket) |
| Konkurs 9M113 | (anti-tank missile) |
| VoG 30mm HE | (grenade, High Explosive) |
| SPG 9 | (recoilless gun ammunition) |
| PG 9 | (recoilless gun ammunition) |
| PG-7 | (recoilless gun ammunition) |
| OG   9MZ | (recoilless gun Fragmentation HE ammunition) |
| TBFR 9 | (recoilless gun Termobarc/Fragmentation ammunition) |
| 130 mm | (anti-aircraft ammunition) |
| 7.62 x 54mm | (assault rifle ammunition) |

**A.    Restrictions on Brokering Activities to Libya**

9.    No brokering activities involving Libya may be carried out by any person without

- 4 -

first obtaining the written approval of the Department of State, Directorate of Defense Trade Controls ("DDTC"). It is the policy of the United States to deny licenses or other approvals for exports or imports of defense articles and defense services destined for or originating in Libya, except, on a case by case basis, for [certain non-lethal defense items]. 22 C.F.R. §§ 126.1 and 129.5.

**B.      Brokering Activities**

10.      A broker is defined under 22 C.F.R. § 129.2(a) as "any person who acts as an agent for others in negotiating or arranging contracts, purchases, sales or transfers of defense articles or defense services in return for a fee, commission, or other consideration."

11.      "Brokering activities" are defined under 22 C.F.R. §129.2(b) as "acting as a broker as defined in § 129.2(a), and includes the financing, transportation, freight forwarding, or taking of any other action that facilitates the manufacture, export, or import or a defense article or defense service, irrespective of its origin.

**C.      Broker's License**

12.      The AECA prohibits a broker, or any other person as defined in 22 C.F.R. § 129.2(b), from engaging in "brokering activities" without first obtaining a license from DDTC. 22 U.S.C. § 2778 (b)(1)(A)(ii)(III); 22 C.F.R. § 129.6.

13.      The AECA applies to U.S. persons brokering foreign defense articles. 22 C.F.R. § 129.2.

14.      A broker's license application shall identify all parties involved in the proposed transaction and their roles, as well as outline in detail the defense article and related technical data (including manufacturer, military designation and model number), quantity and value, the security classification, if any, of the articles and related technical data, the country or countries involved, and the specific end use and end users. 22 C.F.R. § 129.7(d).

//

1    **D.      Misrepresentations and Omission of Material Facts**

2    15.     It is unlawful, in a license application, to willfully and knowingly make any untrue

3    statement of a material fact or omit to state a material fact required to be stated therein.

4    22 U.S.C. § 2778(c) and 22 C.F.R. § 127.3(b).

5    16.     At no time material to this indictment, did defendants, MARC TURI, TURI

6    DEFENSE GROUP, or others known or unknown to the grand jury receive prior

7    approval of the Department of State, DDTC, to engage in brokering activities with Libya,

8    the TNC, the NTC, or any Libyan end user as required by Title 22, Code of Federal

9    Regulations, Sections 126.1 and 129.

10                              **PARTICIPANTS**

11   17.     MARC TURI is the president, director and treasurer of TURI DEFENSE GROUP,

12   a company that purports, in part, to deliver NATO and non NATO equipment,

13   technologies and capabilities to the United States and its allied nations.   At all times

14   material to this Indictment, MARC TURI lived in and worked from a location in the

15   District of Arizona.  MARC TURI and TURI DEFENSE GROUP are also registered with

16   the United States Department of State as a broker and manufacturer of defense articles,

17   and have a history of applying for and receiving both approvals and denials to broker

18   defense articles that precedes the events in this Indictment.  Between February 2011 and

19   July 2011, MARC TURI and TURI DEFENSE GROUP worked with Y.A., A.Y., M.W.,

20   certain Libyans and others known and unknown to further the overall objective of

21   supplying certain Libyans with defense articles.

22   18.     A.D. is a United States citizen and is the president and owner of a weapons'

23   brokering company incorporated in the United States.  A.D. markets his company as an

24   arms brokering company specializing in the sale of arms and munitions manufactured in

25   Eastern Europe to foreign countries claiming compliance with United States' laws and

26   regulations.  A.D.'s company is registered with the United States Department of State as a

27   broker and manufacturer of defense articles.  A.D. and his company have a history of

28

- 6 -

1   applying for and receiving both approvals and denials to broker certain defense articles

2   internationally that preceded the events detailed in this Indictment. A.D. initially agreed

3   with MARC TURI, TURI DEFENSE GROUP, to supply certain Libyans with a

4   substantial quantity of arms.

5   19.   Y.A. is an Egyptian national known to be residing in and conducting business in

6   the United Kingdom as a "broker." A.Y. is an individual working from a location in

7   Cyprus.   A.Y. is affiliated with a company purporting to be a reliable importer and

8   exporter of bulk Russian-origin petroleum products furnished from "reputable and

9   reliable producers and suppliers who can deliver high quality products at competitive

10  prices." At all times material to this Indictment, Y.A. and A.Y. worked together and

11  acted as the primary intermediaries between MARC TURI, TURI DEFENSE GROUP

12  and members of the TNC. Between April 2011 and June 2011, MARC TURI and TURI

13  DEFENSE GROUP worked with the Y.A. and A.Y. to supply arms and ammunition to

14  members of the TNC.

15  20.   M.T. is an Emirate national residing in and conducting business in the United

16  Arab Emirates.   At times material to this Indictment, M.T. had agreed to work with

17  MARC TURI and TURI DEFENSE GROUP to assist in the movement of monies for the

18  supply of arms and ammunition to the TNC.

19  21.   M.W. was a dual citizen of the United States and Libya, and acted as a go-between

20  for individuals associated with the TNC and A.Y.

21  22.   A.B.G. is a business located in the United Arab Emirates (U.A.E.) with financial

22  and political connections in the Middle East.

23  23.   M.E.D. is a dual citizen of the United States and Libya, who served as a go-

24  between for MARC TURI, TURI DEFENSE GROUP and individuals associated with the

25  TNC.

26              **FACTUAL ALLEGATIONS**

27  24.   MARC TURI and TURI DEFENSE GROUP, and others known and unknown to

28

the grand jury committed or caused to be committed the following acts, including but not limited to the following:

(a)     On or about March 12, 2011, MARC TURI and TURI DEFENSE GROUP submitted a "Letter of Prior Approval" to the DDTC - listing A.D. as an additional party - that sought permission to conduct certain brokering activities on behalf of the TNC involving $195 million U.S. dollars' worth of Eastern European supplied light and heavy armament and ammunition to support that armament.  DDTC labeled this application BA-L085-11.

(b)     On or about March 12, 2011, MARC TURI sent an electronic mail to Y.A. that indicated: (1) "[d]elivery is dependent on getting us proper signatures that have been requested"; (2) "[p]ayment conditions - [c]onsidering we are in a war payment must be 100% in cash due upon signature of the contract"; (3) "[g]uarantee – all equipment will be NEW IN BOX and delivery to begin "immediately after export licenses"; and (4) "[p]lace of [d]elivery – [d]epends on circumstances especially if no fly zone is imposed but Benghazi is sufficient."  MARC TURI then described the need to have end user certificates signed by the "Military Affairs liaison Mr. Omar Al Hariri," laid out requested payment details and noted that a "import certificate or import waiver certificate on official letter head" will need to be signed in person.  Attached to the electronic mail was a contract for the sale of small arms to the TNC valued at approximately $195 million U.S. dollars along with pictures of small arms and ammunition.

(c)     On or about March 13, 2011, MARC TURI and TURI DEFENSE GROUP submitted a "Letter of Prior Approval" to the DDTC - listing A.D. as an additional party - that sought permission to conduct brokering activities on behalf of the TNC involving $195 million U.S. dollars' worth of Eastern European supplied light and heavy armament

- 8 -

1    and ammunition to support that armament.  DDTC labeled this application BA-L079-11.

2

3    (d)    On or about March 22, 2011, the DDTC denied both of MARC TURI's

4    application to broker weapons to the TNC in BA-L085-11 and BA-L079-11.

5

6    (e)    On or about March 25, 2011, MARC TURI sent an electronic mail to A.D.

7    warning: "State department pulled the plug on us.  Be careful!!!!  I did everything I could

8    in pentagon, senate select and state department.  It's out of our hand until foreign policy

9    changes to support ground forces."  Attached to MARC TURI's electronic mail were

10   copies of DDTC denials related to both BA-L085-11 and BA-L079-11.

11

12   (f)    On or about March 29, 2011, MARC TURI and TURI DEFENSE GROUP

13   submitted a "Letter of Prior Approval" that sought to amend applications BA-L085-11

14   and BA-L079-11 and, in effect, asked for reconsideration of DDTC's denials of both

15   previously submitted applications.  DDTC labeled this application BA-L102-11 and on

16   May 3, 2011 DDTC returned without action MARC TURI and TURI DEFENSE

17   GROUP's application indicating that no brokering applications would be approved as

18   they might relate to Libya.

19

20   (g)    On or about March 29, 2011, MARC TURI and TURI DEFENSE GROUP

21   submitted a "Letter of Prior Approval" that sought permission to conduct brokering

22   activities on behalf of the Government of Qatar involving $267 million U.S. dollars'

23   worth of Eastern European supplied light and heavy armament and ammunition to

24   support that armament.  DDTC labeled this application BA L110-11 and on May 5, 2011,

25   DDTC approved MARC TURI and TURI DEFENSE GROUP's application.

26

27   (h)    On or about March 30, 2011, MARC TURI sent an electronic mail to a U.S.-based

28

consultant specializing in global security, defense issues and foreign policy ("Consultant #1") titled "Packing". In that electronic mail, MARC TURI indicated that he had attached a document containing details related to "[t]he first 12 flights of IL-76 aircraft (http://turidefense.com/blog/?p=53) with weights and dimensions [l]eaving Bulgaria . . . [c]urrently we are looking at a little town close to the Egyptian border to land the planes called Tubruq" and that "[w]e didn't use Benghazi since we heard as of 3 days ago the runway has holes in it."

(i)     On or about April 4, 2011, MARC TURI sent an electronic mail to Consultant #1 titled "Operation". In that electronic mail, MARC TURI indicated that he had attached a document containing a "master sheet," that the "master sheet" is what he "did for Qatar" and that "[t]he price is lower for Libya but it can easily be modified."

(j)     The "master sheet" contained, in part, a list of small arms and ammunition and was titled "Libya". The "master sheet" was dated March 12, 2011, numbered "1001". The quantity of small arms and ammunition was identical, in type and quantity, to an attachment appended to MARC TURI and TURI DEFENSE GROUP's DDTC license application numbered BA-L110-11 which listed Qatar as the end-user.

(k)     On or about April 5, 2011, MARC TURI sent an email to a major small arms manufacturer in Bulgaria titled "RFQ - QATAR". In that electronic mail, MARC TURI indicated he had attached a "request for quote" for new production or surplus equipment with a destination of Qatar. Attached to the electronic mail was a "master sheet" which contained, in part, a list of small arms and ammunition that was titled "Qatar", was dated March 12, 2011, and numbered "1001". The quantity of small arms and ammunition was identical, in type and quantity, to the Libyan master sheet noted above.

- 10 -

(l)     On or about April 5, 2011, MARC TURI sent an email to an individual using the electronic mail address "Manuel@usa-aircharter.com" with a "master sheet" attached that contained a list of small arms and ammunition, was titled "Libya", was dated March 12, 2011 and was numbered "1001".

(m)    On or about May 11, 2011, MARC TURI sent an electronic mail to a U.S.-based business consultant specializing in Eastern European and Middle Eastern affairs ("Consultant #2") that indicated:   (1) "[a]s of May 5th, 2011 BA#-L110-11 has been approved by the DDTC"; (2) "[t]he only way this deal will work is if the Qatar Govt is the end user, the Mod signs contract and end user certificate"; (3) "[w]e have the deal financed out of UAE"; (4) "[a]ll they ask in return is that they establish relationship with Jibril and the council for future oil relationship in Libya once the fighting settles down"; and (5) "[i]n addition they would like to come to Benghazi to discuss."

(n)     On or about May 12, 2011, MARC TURI sent the same electronic mail described in paragraph 24(m) to Y.A., his London-based broker with the TNC.  Attached to this electronic mail was the license approval for Qatar for BA-L110-11.

(o)     On or about May 12, 2011, MARC TURI sent an additional electronic mail to Y.A. titled "Sample EUC". The electronic mail indicated that MARC TURI had attached a sample EUC that "needs to be changed to Qatar, along with adding the supply list" and that "[w]e obviously will need it on MOD letterhead."

(p)     On or about May 19, 2011, MARC TURI received an encrypted electronic email from Consultant #2 that stated three members of the TNC government, including the Head of Military Procurement, TNC Misrauta Representative, and TNC Representative to Qatar, will meet MARC TURI and M.E.D., a facilitator, who had direct access to the

TNC on Monday May 23, 2011 in Dubai.

(q)     On or about May 23, 2011, MARC TURI representing the TURI DEFENSE GROUP met with M.E.D., M.T. and individuals associated with the TNC and A.B.G in Dubai.  The purpose of the meeting was to discuss the proposed TNC / Libyan arms deal between MARC TURI, the TURI DEFENSE GROUP and the TNC.

(r)     On or about May 26, 2011, in response to an electronic mail forwarded by Y.A. that described various TNC concerns with MARC TURI and TURI DEFENSE GROUP's proposed sale involving Qatar, MARC TURI indicated, among other things, "[e]nd user is Qatar . . . because US Dept of state denied Libya", the price is higher because "[t]he first list has different equipment", and "how Qatar gets reimbursed is for a separate discussion."

(s)     On or about May 31, 2011, MARC TURI sent an electronic mail to Y.A. and A.Y. titled "State Department Submissions".  In the electronic mail, MARC TURI indicated that he understood "the level of frustration" and "attached are some documents that I will discuss in a following email that will be encrypted" and "[f]rom this point forward only communicate with me by this means."  Attached to the email was: (1) the applications MARC TURI and TURI DEFENSE GROUP submitted seeking to broker weapons on behalf of the TNC that DDTC labeled BA-L085-11 and BA-L079-11; (2) the denials DDTC issued, two months earlier, related to these applications; and (3) the application MARC TURI and TURI DEFENSE GROUP submitted seeking to broker arms on behalf of the Qatari government.

(t)     On or about May 31, 2011, MARC TURI sent an encrypted electronic email to Y.A. and A.Y. titled "Response".  In the email MARC TURI indicated that: (1) "the

purpose of the deal was to get State Department Approval"; (2) "[s]ince the State Department denied Libya we had to choose another country and that was Qatar"; (3) "[a]nd we now are the only company with approval to deliver $267,000,000 of equipment to Qatar"; (4) "we have also established a plan to have the Qataris reimbursed for the deal"; (5) "[h]ow Qatar is reimbursed that will be discussed privately with our banker"; (6) "[t]here is nothing the Libyans need to do in this deal with the exception of providing a guarantee of oil reserves to my banker so that Qatar can get reimbursed for their payment to us"; (7) "[k]eep in mind the reason why the equipment is going to Qatar is because Nato controls Eastern Europe"; (8) "[i]f the United States is not in agreement with the country of destination no equipment will get past any export committee in Eastern Europe"; (9) "[t]hat is why Qatar was chosen"; and (10) "[o]nce the equipment leaves Eastern Europe it is now in Arab hands."

(u)     On or about June 2, 2011, MARC TURI contacted a former State Department Official who was previously stationed in Qatar and described his planned weapons  deal to Libya, which was to be transshipped through Qatar, and financed by the Qataris' in exchange for Libyan oil.

(v)     In June, 2011, MARC TURI representing the TURI DEFENSE GROUP met with M.E.D. and others in Dubai to discuss using the U.A.E. as a purported end user in place of Qatar for the TNC / Libyan arms deal.

(w)     On or about June 10, 2011, MARC TURI sent an encrypted electronic mail titled "Qatar" to an individual associated with A.B.G.  In the electronic mail MARC TURI indicated that he had "been on this deal since the beginning for the new side", that they had "everything in place", but that they needed a "guarantee that there is oil to back the deal" because [his] banker is in Dubai and "will fund at least 80% of the transaction value

- 13 -

as long as there is oil."  MARC TURI also stated that: (1) he had attached "the only US Dept. of State approval for this transaction"; (2) he had provided "a credible, legal supply chain out coming out of NATO countries"; (3) [o]nce the supply gets into the Arab world its in the Arab world and stays their" noting [o]utside of international scrutiny"; (4) "[w]e tried getting approval directly with the Libyan transitional council but they denied us . . . so we came up with the alternative" noting 'the deal is with Qatar"; and (5) "[a]ll of the supply in Eastern Europe we control at this point because we have managed to do the deal the right way."

(x)     On or about June 11, 2011, MARC TURI and TURI DEFENSE GROUP submitted a "Letter of Prior Approval" to the DDTC that listed an individual associated with A.B.G. as an additional party and sought permission to conduct brokering activities on behalf of the United Arab Emirates Ministry of Defense involving $267 million U.S. dollars' worth of Eastern European supplied light and heavy armament and ammunition to support that armament.  The weapons involved were the same as those listed in DDTC application BA-L110-11, on which Qatar was listed as the end user.  DDTC labeled this application BA-L189-11.

(y)     On or about June 12, 2011, MARC TURI sent an encrypted electronic mail to an individual associated with A.B.G. titled "UAE".  In the electronic mail, MARC TURI indicated that he "submitted this document yesterday to State Department for UAE approval if we dont use Qatar."  The documents attached were the same documents submitted to the DDTC related to BA-L189-11.

(z)     On or about June 20, 2011, MARC TURI sent an encrypted electronic mail to an individual associated with A.B.G. titled "update".  In the electronic mail, MARC TURI indicated that "I just got off with my guys working on the letter and they indicated two

confirmation letters and 1 request were sent to Qatar for Mahmoud jibril to sign", and "they confirmed one of two things will happen today either Jibril will sign or we will receive a confirmation from one of the council members."

(aa)   On or about June 21, 2011, Y.A. forwarded an unencrypted electronic mail to MARC TURI and requested that MARC TURI advise him.   The electronic mail indicated: (1) "NOW WE ARE MORE THAN HALFWAY DONE WE NEED TO AGREE ON SOME THINGS . . ."; (2) "DOCUMENTS (INVOICE, AGREEMENTS. . ETC), LEFT BENGHAZI ON QATARI AIR LINE ON 1:20 LIBYA TIME, AND ARRIVED 5 HOURS LATER"; (3) "DR MAHMOUD . . . CONFIRMED RECEIVING THOSE"; (4) "THE LIBYAN GROUP IS REQUESTING . . . 10% OF THE TOTAL OF ANYTHING IS DONE THROUGH TURI GROUP"; (5) "A BANK GUARANTEE BEFORE FINALIZING THIS DEAL"; and (6) "ONCE AGREEMENT SECURED, A MEETING WILL BE GRANTED BETWEEN MR. MARC AND DR MAHMOUD".

(bb)   On or about June 21, 2011, MARC TURI sent an encrypted electronic mail to an individual associated with A.B.G. titled "FYI".  In the electronic mail, MARC TURI expressed extreme  concern for the "operational security" of his Libyan weapons deal, for which he was the supplier, in that the Libyan component "talk way too much and to the wrong people.  They can not be trusted to keep their mouths shut and this is a problem. . . and requesting a document from them has brought attention to me on a subject that the US Dept. of State has denied me from dealing with" and placed him in a "compromising situation" because MARC TURI had been denied from dealing with Libya.

(cc)   On or about June 22, 2011, MARC TURI sent an encrypted electronic mail to Consultant #3 titled "Today".   In the electronic mail, MARC TURI noted that he "managed today to get control over the situation",  they "should have everything wrapped

up tonight and tomorrow", they "were able to by pass the clowns and get to the Chairman of the council," and they "have a followup discuss in the next couple of hours."

(dd)   On or about June 22, 2011, an individual associated with A.B.G. sent an encrypted email to MARC TURI titled "RE: update". In the email the individual noted that "there are new updates," "[t]hey found ways to ship direct but in small quantities", "[t]hey still need the letter but we need to add that NTC gaurantee the amount to the UAE", there are "funds cash in UAE from Libya accts. seized by UAE government" "[t]hey are willing if NTC gaurantee to take them and pay for goods", "[t]his is the only and fastest way to do it", and "[t]hey are not loosing anything cause for them these funds are lost so this should be a good deal for them."

(ee)   On or about June 22, 2011, MARC TURI sent encrypted emails to A.Y. and an associate of Y.A. with a draft of a "Confirmation Letter" attached. The letter was drafted for the signature of Mahmoud Jibril, Prime Minister, Libyan National Transitional Council, Benghazi Libya, and included a list of arms nearly identical to the list attached to DDTC applications BA-L085-11 and BA-L079-11, and identical to BA-L110-11 and BA-L189-11. The Confirmation Letter noted that "[t]his letter confirms the Libyan Republic Interim Transitional National Council & Opposition Forces remain interested in the supply listed below that was submitted to the U.S. Department of State back in March 2011", and indicated that "[t]he equipment will be utilized to defend the rights of the people of Libya".

(ff)   On or about June 24, 2011, M.W. sent A.Y. an email indicating that individuals associated with the TNC had approved the proposed weapons list.

(gg)   On and about June 29, 2011, MARC TURI sent an encrypted email to an

- 16 -

1    individual associated with the A.B.G. with a draft of a "Confirmation and Guarantee

2    Letter" attached.   The letter was drafted for the signature of Mustafa Abdul Jalil,

3    Chairman, Libyan National Transitional Council, Benghazi Libya, and included a list of

4    arms nearly identical to the list attached to DDTC applications BA-L085-11 and BA-

5    L079-11, and identical to BA-L110-11 and BA-L189-11.   The Confirmation and

6    Guarantee Letter noted that "[t]his letter confirms the Libyan National Transitional

7    Council remains interested in the supply listed below" and indicated that "[t]he Libyan

8    National Transitional Council guarantees to the UAE Government the repayment of the

9    total value of the list below and agrees to discuss a repayment mechanism at a later date."

10

11

12                              **COUNT 1**

13                    **(Violation of the Arms Export Control Act**

14            **22 U.S.C. § 2778(c); 22 C.F.R. §§ 126.1, 127.2 and 127.3.)**

15    25.    The factual allegations in paragraphs 1 - 24 of the Indictment are incorporated by

16    reference and re-alleged as though fully set forth herein.

17    26.    On or about March 29, 2011, in the District of Arizona and elsewhere, MARC

18    TURI and TURI DEFENSE GROUP, in an application for a license to broker weapons,

19    did willfully and knowingly make and cause to be made a material untrue statement and

20    omitted a material fact required to be stated therein by listing the Government of Qatar as

21    the end user of certain described USML items when, in fact, MARC TURI and TURI

22    DEFENSE GROUP then knew that the actual intended end user of the listed USML items

23    were individuals in Libya.

24            All in violation of Title 22, United States Code, Section 2778(c), and Title 22

25    Code of Federal Regulations, Sections 126.1, 127.2, and 127.3.

26

27

28

                                   - 17 -

## COUNT 2

### (Violation of Submitting a False Document to a Government Agency
### 18 U.S.C. § 1001(a)(3)

27.     The factual allegations in paragraphs 1 - 24 of the Indictment are incorporated by

reference and re-alleged as though fully set forth herein.

28.     On or about March 29, 2011, in the District of Arizona and elsewhere, MARC

TURI and TURI DEFENSE GROUP, did willfully and knowingly make and cause to be

made, and use and cause to be used, in a matter within the jurisdiction of a department or

agency of the United States, that is the U.S. Department of State, Directorate of Defense

Controls, a false writing or document, knowing the same to contain a materially false,

fictitious, and fraudulent statement. MARC TURI and TURI DEFENSE GROUP, in an

application for a license to broker weapons, did willfully and knowingly make and cause

to be made a material false, fictitious, and fraudulent statement therein by listing the

Government of Qatar as the end user of certain described USML items when, in fact,

MARC TURI and TURI DEFENSE GROUP then knew that the actual intended end user

of the listed USML items were individuals in Libya.

All in violation of Title 18, United States Code, Section 1001(a)(3).


## COUNT 3

### (Violation of the Arms Export Control Act
### 22 U.S.C. § 2778(c); 22 C.F.R. §§ 126.1, 127.2 and 127.3.)

29.     The factual allegations in paragraphs 1 - 24 of the Indictment are incorporated by

reference and re alleged as though fully set forth herein.

- 18 -

30.     On or about June 11, 2011, MARC TURI and TURI DEFENSE GROUP, in the District of Arizona and elsewhere, and in an application for a license to broker weapons, did willfully and knowingly make and cause to be made a material untrue statement and omitted a material fact required to be stated therein by listing the Government of United Arabs Emirates as the end user of certain described USML items when, in fact, MARC TURI and the TURI DEFENSE GROUP then knew that the actual intended end user of the listed USML items were individuals in Libya.

All in violation of Title 22, United States Code, Section 2778(c), and Title 22 Code of Federal Regulations, Sections 126.1, 127.2, and 127.3.

## COUNT 4

### (Violation of Submitting a False Document to a Government Agency
### 18 U.S.C. § 1001(a)(3))

31.     The factual allegations in paragraphs 1 - 24 of the Indictment are incorporated by reference and are alleged as though fully set forth herein.

32.     On or about June 11, 2011, MARC TURI and TURI DEFENSE GROUP, in the District of Arizona and elsewhere, did willfully and knowingly make and cause to be made, and use and cause to be used, in a matter within the jurisdiction of a department or agency of the United States, that is the U.S. Department of State, Directorate of Defense Controls, a false writing or document, knowing the same to contain a materially false, fictitious, and fraudulent statement. MARC TURI and TURI DEFENSE GROUP, in an application for a license to broker weapons, did willfully and knowingly make and cause to be made a material false, fictitious, and fraudulent statement by listing the Government of United Arabs Emirates as the end user of certain described USML items when, in fact,

1   MARC TURI and the TURI DEFENSE GROUP then knew that the actual intended end

2   user of the listed USML items were individuals in Libya.

3         All in violation of Title 18, United States Code, Section 1001(a)(3).

4

5                                 A TRUE BILL

6

7                                 /s/

8                                 FOREPERSON OF THE GRAND JURY
                              Date: February 11, 2014

9

10   JOHN S. LEONARDO
    United States Attorney

11   District of Arizona

12   /s/

13

14   DAVID PIMSNER
    KRISTEN BROOK

15   Assistant U.S. Attorneys

16

17

18

19

20

21

22

23

24

25

26

27

28

                        - 20 -