1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3          _____

4  United States of America,        )
                                     )
5                   Plaintiff,       )  CR-14-00191-PHX-DGC (DKD)
                                     )
6          vs.                       )  Phoenix, Arizona
                                     )  April 24, 2015
7  Marc Turi, Turi Defense Group,    )
                                     )
8                   Defendants.      )
   _____)

9

10

11

12

13       BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               STATUS CONFERENCE

16

17

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

3     For the Government:

4             U.S. Attorneys Office
              By:  **KRISTEN BROOK,** ESQ.
5             By:  **DAVID PIMSNER,** ESQ.
              40 N. Central Ave., Ste. 1200
6             Phoenix, AZ  85004

7

8     For the Defendants:

9             Perkins Coie, LLP
              By:  **JEAN-JACQUES CABOU,** ESQ.
10            BY:  **ALEXIS DANNEMAN, ESQ.**
              P.O. Box 400
11            Phoenix, AZ  85001

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Criminal case 2014-191, United States of America versus Marc Turi, on for status conference.

MR. PIMSNER:  Good afternoon, Your Honor.  David Pimsner and Kristen Brook for the United States.

MR. CABOU:  Good afternoon, Your Honor.  J. Cabou and Alexis Danneman from Perkins Coie on behalf of the defense.

THE COURT:  Good afternoon.

All right.  Counsel, go ahead and have a seat.

Let's address a few things.  The defendants have filed this motion to obtain security clearance.  It's at Docket 131.  It was originally filed under seal and I asked, or directed, the defense to file it -- well, it was filed ex parte and I asked them to file it so that the government could see it and address it.

I guess the question I have for you, Mr. Pimsner or Ms. Brook, is whether you have any objection to providing the security clearances or processing the security clearances that the defendants request.

MR. PIMSNER:  Your Honor, security clearances are commensurate with need.  Our position is that it's our understanding that CISO will be travelling out on Monday, and we --

THE COURT:  What will be travelling out?

15:13:02  1         MR. PIMSNER:  The court information security officer.

2     I always knew him as CISO.  Scooter Slade will be travelling

3     out with a filing that we have pursuant to 18 U.S.C. Appendix

4     3, and after the Court's had an opportunity to review that

15:13:20  5     motion, the Court will be in a position to evaluate the need

6     for some clearances.

7         THE COURT:  I don't think I understand that.  There

8     are many things suggested in this motion other -- I presume,

9     other than Categories 1 and 2 of my order at Docket 63 that

15:13:41 10     the defense say they need clearance in order to investigate.

11     Will your motion be addressing all of those?

12         MR. PIMSNER:  No.  The motion addresses the need for

13     the type of classified information, if it all exists, that the

14     defendant is entitled to review.

15:13:59 15         THE COURT:  What are your thoughts on these various

16     other investigative steps that are outlined in the motion,

17     that the defense team feels they need to pursue?

18         MR. PIMSNER:  We don't have sufficient information to

19     respond to whether or not it even involves classified

15:14:14 20     information based on what was detailed in the motion or

21     redacted.  We can't make that assessment.  We know of no

22     classified information that -- regarding the specific

23     allegations.

24         THE COURT:  What is the government willing to do -- I

15:14:35 25     understand from the motion that there's at least some security

15:14:37   1    clearances you're willing to process.

2        MR. PIMSNER:  And the motion addresses that, Your

3    Honor.

4        THE COURT:  Well, what is the government willing to

15:14:47   5    do?

6        MR. PIMSNER:  The government is willing to have lead

7    counsel, two lead counsels, obtain security clearance.

8        THE COURT:  All right.  So when I see this Section 3

9    motion, what is going to enable me to decide whether two or

15:15:07  10    three or four of the defense team members would be the

11    appropriate level of security clearance?

12        MR. PIMSNER:  If the investigation, specific steps of

13    the investigation, determine that -- the defense determines

14    there's other information out there that we're not aware of,

15:15:28  15    then we may have to readdress the classification issue.  But

16    we're not aware of anything with the purported individuals

17    that they have identified.

18        THE COURT:  Where in the process is the clearance of

19    the two counsel you're willing to process?

15:15:51  20        MR. PIMSNER:  My understanding is the court security

21    officer would have reached out to them.  I'm assuming that has

22    happened.

23        MR. CABOU:  Your Honor, Mr. Slade contacted my office

24    a couple weeks ago.  I informed him that I already hold and am

15:16:09  25    in the process of finalizing a TS clearance.  He was glad to

15:16:14  1   hear that, and he's working with that information.  I gave him

2   the number of my application and all of that.  He also got

3   Mr. Ryerson's clearance started, but I have no further

4   information beyond that.

15:16:26  5            THE COURT:  How long do you understand it will take?

6            MR. CABOU:  I honestly don't know, Your Honor.  I

7   understand there is a wide range of timing often associated

8   with this process, and I think the government is in the best

9   position to answer that question.

15:16:39  10           MR. PIMSNER:  Well, I'm not in a position to give a

11   specific deadline because I don't know the length of the

12   process.  It varies depending on how backlogged it is.  If

13   there's already an interim clearance in place, my guess is

14   that will accelerate the clearance process.  But we don't

15:17:00  15   control that, Your Honor.

16           THE COURT:  Mr. Cabou, what is your response to

17   Mr. Pimsner's comments about the motion you filed?

18           MR. CABOU:  Your Honor, my response is that we have

19   disclosed all the information that we're required to disclose

15:17:20  20   by law, which in a CIPA case is substantially more information

21   about our investigation and possible defenses than we would

22   otherwise have to disclose.  But we believe that there is no

23   proper basis upon which the government should object to us

24   asking to be allowed to follow the same information security

15:17:42  25   procedures that government employees and prosecutors can

15:17:45 1    follow, and to observe them in order to conduct our

2    investigation.

3            We're not fishing.  We're not making this up.  We

4    have specified in as far as we believe strikes a balance

15:17:58 5    between our right to investigate and their need to know, and

6    we are trying to make a good faith effort at that.

7            We have specified there are specific people we would

8    like to speak to.  They're both percipient and expert,

9    potentially, witnesses and we'd like the clearances and

15:18:16 10   permissions necessary to speak with those individuals and

11   interview them about items relevant to the defense that the

12   government, frankly, is not entitled to know about right now.

13   And we're unaware of any basis upon which they can produce

14   authority to say that we're not allowed to conduct defense

15:18:37 15   investigation where we are otherwise willing to comply with

16   any classification procedure or other restriction that the

17   Court and law might provide for.

18            THE COURT:  And why can't you do that with two

19   cleared lawyers?

15:18:51 20            MR. CABOU:  Your Honor, to be fair, this is

21   relatively new information the government hasn't had a chance

22   to respond yet, but one reason and probably the best reason is

23   Mr. Ryerson is currently in quite a health state.  He's been

24   in and out of the hospital for the last couple weeks with what

15:19:07 25   I believe is Meniere's disease.  He is trying to work, but he

15:19:11  1    has left the office many days in the last few days.  In fact,

2    that's why he's not here, he's having an MRI right now.  So

3    especially because of Mr. Ryerson's health condition, I just

4    don't know that I can count on him.

15:19:23  5         I would also note they have at least four cleared

6    lawyers.  We're not asking for very much.  Ms. Danneman

7    previously held a secret clearance for her work at the State

8    Department.  But we're not trying to overreach, we're not

9    trying to make extra work for anyone, but we are trying to

15:19:34 10    defend a very complicated case on a very accelerated time

11    schedule, and especially because we still have zero classified

12    documents despite the fact they were ordered in October.  Our

13    work will be obviously compressed.  And especially with that

14    in mind, we believe it is reasonable to have as many people as

15:19:50 15    they have.

16         THE COURT:  What would these clearances enable you to

17    do with the potential witnesses listed on pages 3 and 4 that

18    you couldn't otherwise do?

19         MR. CABOU:  Well, Your Honor, part of this is

15:20:06 20    hypothesis on my part because obviously the witnesses who we

21    believe have classified information that's relevant have not

22    talked to us about that information because to do so would be

23    illegal.  That said, we believe that, for example, T.S. and --

24    I'm sorry, is this -- for the record, are we -- is this a

15:20:28 25    sealed hearing at this moment or is it not?  Do we care?  Does

15:20:31   1    the government have objection?

2    THE COURT:  Nobody's asked that it be sealed.  I

3    don't typically seal it unless somebody asks.

4    MR. CABOU:  That's fine.  That's fine with us.

15:20:40   5    At the last hearing the government acknowledged that

6    there was a relationship with T.S. and Mr. Turi.  We want to

7    speak to him, and we want to talk about that relationship.

8    It seems quite obvious from the statements from the

9    last hearing that are on the record that the government has

15:20:59  10    spoken to him.  They said on the record that T.S. didn't say X

11    or Y, and then they kind of changed the subject, but they did

12    say that on the record.  This is probably relevant to things

13    we'll take up later today, but we have no memoranda or any

14    documentation of any interview with T.S.

15:21:18  15    THE COURT:  My question, Mr. Cabou, was what can you

16    do with the clearance in talking to T.S. that you cannot do

17    without a clearance?

18    MR. CABOU:  Your Honor, frankly I don't know the

19    limit of what T.S. could tell me about with or without the

15:21:33  20    clearance.  But I believe that he will grant us an interview

21    and that he will be helpful.  And I believe that the details

22    of his work are likely classified.

23    As in -- the same with D.M. and the same with other

24    people that we would like to speak with about sensitive means

15:21:52  25    by which the Central Intelligence Agency engages in the covert

15:21:56  1    transfer of arms to sympathetic regimes.  And that is a topic

2    on which we have long said we intend to produce expert

3    testimony.  We don't know if it will be classified.  If it is,

4    we'll obviously file the appropriate notice under CIPA.  But

15:22:14  5    we're still very, very limited in our ability to investigate

6    the center of our defense, which is public authority.

7         And in order to -- the government has denied that he

8    had public authority.  They haven't actually said that in any

9    kind of filing, but we can infer they deny that he had public

15:22:32  10   authority.  We need to explore the means by which public

11   authority is conferred in this very odd context.  And to do

12   that, we need to speak with people familiar with that.  And

13   those people are likely going to, in order to fully explain

14   this context and means and methods by which these tasks are

15:22:49  15   accomplished, are going to need to disclose classified

16   information.

17        THE COURT:  Mr. Pimsner, given Mr. Ryerson's health

18   issues, do you have a problem adding Ms. Danneman to the list

19   of lawyers --

15:23:00  20       MR. PIMSNER:  No, Your Honor.  No, Your Honor.

21        THE COURT:  Will you take steps to start the

22   clearance process for her --

23        MR. PIMSNER:  I will send the court security officer

24   an e-mail today.

15:23:09  25       THE COURT:  All right.

15:23:09   1          What I'm going to do is grant the motion to the

2     extent of Ms. Danneman.  I can't conclude based on what you've

3     given me so far, Mr. Cabou, that the investigator and

4     paralegal need clearance as well.

15:23:25   5          If, as we go forward and you start getting documents,

6     that becomes a true need, you can raise this issue again.  But

7     it seems to me having three lawyers on the team, hopefully

8     Mr. Ryerson will regain his health, should allow you to

9     certainly interview witnesses and review the documents that

15:23:43  10    are going to be coming in.

11          So I will grant the motion to that extent that

12     Ms. Danneman be added to Mr. Ryerson and Mr. Cabou as lawyers

13     who are receiving clearance, and I'll otherwise deny the

14     motion at Docket 131, without prejudice to you raising it

15:24:01  15    again if a paralegal and investigator truly need clearance at

16     some point.

17          Let's talk about the matrix.

18          The matrix begins with Categories 1 and 2.  Am I

19     correct, Mr. Pimsner, in understanding from the matrix that

15:24:21  20    the government has not yet produced a single document under

21     either of these categories?

22          MR. PIMSNER:  That's correct, Your Honor.  Because,

23     if the Court recalls our discussions, that back in October

24     that the Court was going to take this as a two-step process,

15:24:36  25    the Rule 16 evaluation and then a Section -- the CIPA

12

15:24:43  1  evaluation.

2       We have -- in the interim time we have asked the

3  Court for clarification.  The Court granted us an ex parte

4  hearing.  The Court set the briefing schedule for that

15:24:56  5  hearing.  Afterwards the Court wanted us to address issues

6  publicly, which we addressed.  That was addressed and briefed

7  pursuant to court order through February 20th.  And then the

8  Court set a hearing on that on March 4th.  We addressed that.

9  And we have been preparing the final version of what's a very

15:25:21 10  sophisticated, complex process.  It's not -- it's very

11  detailed.  That has been ready to come out to this Court at

12  the Court's discretion for the past approximately a week.  And

13  my understanding is that the court security information

14  officer is coming out next week and that will be officially

15:25:45 15  filed at that time.

16       THE COURT:  I would be more sympathetic to that

17  argument, Mr. Pimsner, if I thought that the arguments that

18  the government had made on March 3rd were meritorious.  In my

19  view they weren't even close to meritorious.

15:25:57 20       MR. PIMSNER:  I understand, Your Honor.

21       THE COURT:  The arguments that were raised in

22  January, in my view, shouldn't, at least the ones I asked you

23  to address publicly, shouldn't have been in the private

24  setting where they were initially raised.

15:26:07 25       So it seems to me that we've lost months over

15:26:13  1   arguments that weren't very close to the mark in terms of

2   relevancy.  That's my frustration.

3        It seems to me if there are document-specific or

4   information-specific issues that I need to resolve in terms of

15:26:29  5   whether they're helpful to the defense, whether they're

6   subject to appropriate protection, we should have been

7   addressing that months ago.  And I'm hoping that this motion

8   that's coming out next week is that level of specificity.

9        MR. PIMSNER:  We believe it is.

15:26:49  10   THE COURT:  All right.  What I'm going to do when I

11   rule on that motion, and I hope to be able to rule next week

12   when Mr. Slade is here.  I've only got about two half days

13   that I can spend reviewing what he brings.  Then when I

14   finish, he puts it in his briefcase and takes it back.  I

15:27:08  15   can't keep it here to work on weekends or the following weeks,

16   and I won't have any time until late May if I can't get it

17   done next week.  So I hope in the two half days when he's here

18   I can get a ruling out.

19        If i do and if I require production, I'm going to set

15:27:23  20   a fairly short time period to get those documents produced so

21   that we can move this case forward.

22        MR. PIMSNER:  Understood, Your Honor.

23        THE COURT:  All right.  I think that is all we need

24   to address in the first two categories in the matrix.

15:27:36  25        There are several categories where the objection from

15:27:41  1    the defense is "we've been told it's coming and it isn't here

2    yet" and the response from the government is "it's coming."

3    That includes categories 3, 4, 7, 8, 9, and 11.  And it looks

4    as though, at least with respect to some of those, the

15:28:08  5    information was produced on April 17th.  At least that's the

6    assertion in the matrix.

7         So what I need to know is, we'll go through these one

8    at a time, where there's an issue I need to resolve.

9         Is there something I need to resolve on item 3?

15:28:26  10        MR. CABOU:  No, Your Honor.

11        THE COURT:  How about 4?

12        MR. CABOU:  No, Your Honor.  That disclosure was also

13    provided and there's no issue there.

14        THE COURT:  7?

15:28:44  15        MR. CABOU:  7 remains a significant item of

16    disagreement between the government and the defense, and

17    perhaps, having disposed of items 1 and 2, the most

18    significant.

19        MR. PIMSNER:  Your Honor, we provided a written

15:28:58  20    response, and I can just read just a very brief part of that.

21    Basically --

22        MR. CABOU:  Mr. Pimsner, I'm sorry to interrupt you,

23    but if you could just tell me what you're reading from so I

24    can get it in front of me.

15:29:15  25        MR. PIMSNER:  The letter that you received yesterday.

15:29:23  1        Mr. Mackie has been working this issue directly with

       2   State Department.  He's been working with their general

       3   counsel for the Department of State and various components of

       4   Department of State.

15:29:33  5        He has indicated that, "As a threshold issue, the

       6   State Department did not have nor currently has a single

       7   consolidated database of all department-related e-mail or

       8   written communications.

       9        "Moreover, this process has further been complicated

15:29:47 10   by the ongoing multiple inquiries and investigations relating

      11   to events in Libya during 2012, including with the events

      12   associated with the assault on the U.S. consul in Benghazi.

      13        "As of this date there have been no responsive

      14   records located and we're not aware of any e-mail

15:30:05 15   communications between your client and Christopher Stevens,

      16   apart from the single brief e-mail communications dated 4/6/11

      17   and 4/7/11, which your client possesses.

      18        "That being said, the State Department's office of

      19   legal advisor report that their search of multiple servers

15:30:22 20   communications regarding or associated with the defendants and

      21   Chris Stevens should be completed by April 30th.  Any

      22   responsive documents will be provided promptly."

      23        As to the other records from the state department and

      24   DDTC:  "DDTC has assembled a set of records for production

15:30:44 25   which will compliment the DITSA records previously provided.

15:30:46  1   We're working to get them in hand by Friday, together with any

2   appropriate affirmative representations as to the lack of any

3   records with respect to any of the DDTC components identified

4   in the discovery matrix.  We will provide those records to you

15:31:02  5   promptly as we can after receipt."

6           THE COURT:  The Stevens e-mails are Item 11; right?

7           MR. PIMSNER:  Yes.  I believe so.

8           THE COURT:  Okay.  On Item 7 that we were on that

9   lists various bureaus and case numbers, is that the --

15:31:21 10           MR. PIMSNER:  That's the second part that I read.

11           THE COURT:  Okay.  And you say that you have

12   documents in hand that you're going to produce?

13           MR. PIMSNER:  They're trying to receive -- we have

14   given some DDTC records and some records regarding DITSA.  We

15:31:39 15   have continually asked for responsive records with the State

16   Department.

17           According to counsel, my co-counsel, DDTC is trying

18   to get a full packet, including whether affirmative basic

19   responses saying it doesn't exist in hand.  Today they were

15:32:03 20   trying to get it turned over to main justice.

21           I had a communication with co-counsel Mackie earlier

22   this afternoon.  He had not received it yet, but he was

23   following up.  So as of the time we came over we don't have it

24   yet, but we're trying to respond as soon as we can.  As soon

15:32:22 25   as we receive it, we'll respond.

17

15:32:26  1        THE COURT:  And do you think that those documents

2   will be responsive to the eight bullet points that are set out

3   in Item 7?

4        MR. PIMSNER:  That's our intent.

15:32:39  5        THE COURT:  What has to happen once the documents get

6   to Justice?

7        MR. PIMSNER:  They'll be shared with us, we'll review

8   them, and we'll get them out if they're responsive to those

9   categories.

15:32:51  10        THE COURT:  Do you have any sense for the volume?

11        MR. PIMSNER:  I don't.

12        THE COURT:  Mr. Cabou.

13        MR. CABOU:  Well, Your Honor, of course we want the

14   documents, but those are documents we originally requested in

15:33:08  15   July.  And what Mr. Mackie did not read in the letter -- what

16   Mr. Pimsner did not read in Mr. Mackie's letter was that

17   they'd said they have been continually searching since early

18   this year to locate responsive records.  Our point is they're

19   not trying very hard.  Starting in January to comply with a

15:33:26  20   discovery request tendered in July and ordered complied with

21   in October is just not a good faith compliance.

22        THE COURT:  Item 7 isn't within the October order;

23   right?

24        MR. CABOU:  Well, Your Honor, it was on the agenda at

15:33:42  25   that hearing and that was -- if you'll recall, they

15:33:44  1    volunteered and your order of that date references they

2    volunteered to produce what were then known as Categories 8

3    and 9 documents, and your order specifically references

4    they're going to produce it.

15:33:55  5         THE COURT:  I know that.  I don't know what these

6    categories -- what Item 7 falls into in terms of categories.

7         MR. CABOU:  Your Honor, I'm sorry about the confusion

8    with the numbering.  But what is Item 7 on the discovery

9    matrix before us at this hearing was entirely Category 9 of

15:34:14 10    the original motion to compel on which Your Honor ruled on

11    October 22nd.  So these are not new requests.  These are

12    within the ambit of the Court's hearing.  The Court did not

13    specifically order them, only because they volunteered to

14    produce them.  And that was in October.  So this is not new.

15:34:35 15    We -- whatever problems there are, they're telling us about

16    them very late and it doesn't seem like they've been working

17    very hard.

18         THE COURT:  Mr. Pimsner, do you agree that the items

19    in Category 7 of the matrix were the Category 9 documents that

15:34:54 20    we talked about --

21         MR. PIMSNER:  Yes.

22         THE COURT:  -- in this courtroom October 17th?

23         MR. PIMSNER:  Yes.  And we've been attempting to get

24    them since then.  I know Will Mackie has been working with the

15:35:04 25    General Counsel's office.  I have had communications DDTC with

15:35:09  1  the counterespionage section chief well before this case was

       2  even indicted trying to get responsive records, and asking for

       3  all records they had relating to these applications that are

       4  at issue.

15:35:21  5         I don't know if anything new exists.  We've already

       6  given them applications for these various arms transactions

       7  and related documents, including DITSA records.  What else may

       8  exist, I don't know.  But we have not just ignored it.  We

       9  have -- and, you know, Mr. Mackie's language from earlier this

15:35:45 10  year, I don't know if that's when he started engaging directly

      11  with their counsel as opposed to the section component, so I

      12  can't address that.

      13         But I know I've had conversations with DDTC and I

      14  know CES has also in the past, well before indictment.

15:36:07 15         THE COURT:  Well, it seems to me that in order to get

      16  this case ready and on time, somebody needs to give a deadline

      17  to those folks you're speaking with.  It doesn't sound like

      18  they've been all that responsive to you.  I understand they

      19  may have other things to do, but that only underscores the

15:36:25 20  importance of giving them a deadline.

      21         So I'm inclined to set a deadline by which they will

      22  produce the items in Category 7 and I'm inclined to make it

      23  fairly soon, like mid-May or late May at the latest, so that

      24  you can tell them the judge has ordered all of the documents

15:36:42 25  in Category 7 to be produced by this deadline.  What is your

20

15:36:49 1   response to that?

2       MR. PIMSNER:  I'm fine with that, Your Honor.

3       THE COURT:  Well, because I want them to be all

4   documents, so if you get them and you look at them and you say

15:37:03 5   this can't be all and you have to go back again, I want to

6   give you enough time to do that.  So I'm going to set a

7   deadline of May 29th for you to turn over all of the documents

8   responsive to Category 7 in the matrix.  And I'm going to ask

9   you specifically, if you would, Mr. Pimsner, to communicate

15:37:23 10  that to whoever you are asking to collect these documents and

11  tell them that I've established that as a deadline by which

12  they must comply.

13      MR. PIMSNER:  Yes, Your Honor.

14      THE COURT:  How about Category 8?  Is that an issue?

15:37:40 15      MR. CABOU:  That's been resolved.  The government

16  provided that information earlier this week or maybe last

17  week.

18      THE COURT:  All right.  Category 9.

19      MR. CABOU:  9 is -- there's also no issue at the

15:37:51 20  moment with 9.

21      THE COURT:  And 11.  You don't have those yet; right?

22      MR. CABOU:  We do not, Your Honor.  And in terms of

23  11, which are the Stevens e-mails or Stevens documents, I

24  should note that there's -- again, Mr. Mackie's not here and I

15:38:10 25  realize Mr. Pimsner didn't draft the letter, but the letter,

15:38:14   1   some language in the letter, suggests that that they're just

2   looking at things for e-mails between my client and

3   Mr. Stevens and there's a suggestion we should have those.

4   The category is much broader than e-mails between my client

15:38:27   5   and Mr. Stevens and we want to make clear that we are

6   expecting production of the entire category, not just

7   documents exchanged between my client and Mr. Stevens.

8          THE COURT:  Well, what does it include besides

9   communications between defendants and Christopher Stevens?

15:38:52  10          MR. CABOU:  So, for example, the category itself is

11   any communications or other evidence relating to the spring

12   2011 e-mail communications between Defendant and Mr. Stevens.

13   And, for example, one of the things we noted in prior filings

14   with the court and prior letters with the government was that

15:39:10  15   Mr. Stevens' e-mail response to Mr. Turi said that he is

16   passing it along.  In other words, it is strongly implied

17   there were further communications internal to the State

18   Department that Mr. Turi would not have been a party to.  It

19   is those communications, in addition to any direct

15:39:31  20   communications, that are within ambit of this category.

21          THE COURT:  Mr. Pimsner, any additional comments on

22   this?

23          MR. PIMSNER:  And I did address the problem in that

24   letter with this Stevens e-mails, and we're supposed to have

15:39:48  25   the response by April 30th.  If it does not appear to be

22

15:39:52  1    fully -- a full response, we will push back on that issue as

2    well, Your Honor.

3          THE COURT:  Okay.  What I'm going to do is -- and

4    this also goes for the documents you should be getting in the

15:40:04  5    next few days on Category 7.  Turn over to the defense

6    whatever you received that's responsive.  But if you think

7    there's more, I'm going to set the same May 29th deadline for

8    Category 11 of the matrix for you to go back to them and tell

9    them there's a May 29th deadline for communications related to

15:40:23  10   the Stevens communications with the defendants.

11         All right.  Let's go back and talk about the

12   categories we skipped over.  Those include Category 5, which

13   are the handwritten notes or other rough notes made by

14   government agents while interviewing the defendant.

15:40:55  15        I had to read between the lines to fully understand

16   this.  Mr. Cabou, am I correct in surmising that what we have

17   are three interviews, two of which were taped, the other of

18   which where you were present at, and it's the agent's notes of

19   those interviews you want even though you were present for one

15:41:14  20   and you have recording of the others?

21         MR. PIMSNER:  Just for the record, Your Honor, it was

22   prior counsel.

23         THE COURT:  Okay.  That's fine.

24         Am I correct that that's what you're after?

15:41:24  25        MR. CABOU:  Yes, Your Honor.  Their notes of -- we

15:41:27  1    know that there was an interview, as Mr. Pimsner said, I was

2    not present at.  There were two, I believe, uncounseled

3    interviews.  But those -- yes.  So there's two and I don't

4    know if there were other contacts, but those are the three we

15:41:42  5    know of.

6              THE COURT:  And the two uncounseled interviews, you

7    have the tapes of those?

8              MR. CABOU:  I believe that's correct.

9              THE COURT:  So you know exactly what was said during

15:41:51 10    them.

11             MR. CABOU:  Yes.

12             THE COURT:  What is the basis for your view that

13    you're entitled to get the agent's notes of what you already

14    have a video or audiotape of?

15:42:03 15             MR. CABOU:  Well, Your Honor, I guess our view is

16    that the agent's notes are likely to suggest what the agent is

17    focused on and what they think they need to be focused on

18    going forward, and to the extent those notes are inconsistent

19    with the recording, we believe that that would be important

15:42:21 20    evidence to know about.

21             THE COURT:  Well, here's the issue for me when I hear

22    that response.  When I look at Rule 16(a)(1)(A), which is one

23    of the bases for this request on your part, what you're

24    entitled to get is the substance of any relevant oral

15:42:48 25    statement made by the defendant.

15:42:53   1      So it seems to me if you had an agent's notes that

2    hypothetically has four lines, one of which recounts a

3    statement made by Mr. Turi in the interview and the other

4    three of which reflect the agent's thoughts about what he

15:43:08   5    should be charged with, you'd only be entitled to the first

6    line, the substance of the statement made by the defendant.

7          MR. CABOU:  Your Honor, I think that's Rule 16.  We

8    don't quarrel with Your Honor's reading of that section.  I

9    think the issue is as to whether the notes are otherwise

15:43:27  10    discoverable, for example under *Brady*, as they might suggest

11    exculpatory or other evidence.

12          THE COURT:  Well, let's finish, though, with Rule 16.

13          MR. CABOU:  Sure.

14          THE COURT:  Rule 16(a)(1)(B)(ii), which is the other

15:43:40  15    category you've identified, says the same thing: the substance

16    of any relevant oral statement.

17          It seems to me, again with my hypothetical, you could

18    get the first line of the note reflecting what Mr. Turi said,

19    but the other three wouldn't be the substance of an oral

15:44:00  20    statement, it would be the agent's thoughts about the case.

21          MR. CABOU:  We agree with Your Honor.

22          THE COURT:  Okay.

23          If what you're saying is that you think agent notes

24    of these interviews include *Brady* material, isn't that like

15:44:16  25    any other *Brady* issue where the government is the one who has

15:44:19  1   the responsibility for identifying and producing *Brady*?  It's

2   not you; you don't get a free look at it.  It's not me; I

3   don't review all *Brady* material.  It's up to the government to

4   review the notes, and if they find exculpatory information

15:44:34  5   it's their duty to turn it over to you.

6          MR. CABOU:  Your Honor, I agree with Your Honor's

7   construction of the law.  At this moment I don't have any

8   information that is specific to those requests that suggests

9   there's information and they're withholding it.

15:44:48  10         THE COURT:  It seems in light of that, there's no

11  basis for me to order any further production.

12         MR. CABOU:  We will not quarrel with that

13  determination, Your Honor.

14         THE COURT:  Okay.  That takes care of Category 5.

15:45:00  15         Category 6 concerns costs and investigations.

16         It seems to me that if you are entitled to this,

17  Mr. Cabou, it would be under Rule 16(a)(1)(E)(i) as evidence

18  material to preparing a defense.  I can't think of any other

19  basis on which you'd be entitled to it.  Can you think of

15:45:26  20  another one?

21         MR. CABOU:  No, Your Honor.  We agree that our

22  entitlement is as material to preparing defense and

23  specifically materials to the affirmative defense.

24         THE COURT:  Okay.  What I'm having trouble with is

15:45:39  25  understanding how the amount of money the government has spent

15:45:43   1   on their investigation is material to your defense.

2          MR. CABOU:  Well, Your Honor, under the circumstances

3   we face, which is at this moment we have relatively little

4   information about the affirmative defense, one of the things

15:45:59   5   we have candidly thought about is what indicia do we have?

6   What facts can we use to demonstrate that government's

7   investigation?  And their level of interest in the

8   investigation and the resources they've expended on this

9   investigation is inconsistent with a simple case about two

15:46:18  10   pieces of paper, which is what the government would have the

11   jury, potentially, or the Court believe.  This isn't what you

12   do if it's just about a rogue guy in Scottsdale who lied on

13   two pieces of paper.  Rather, this is what you do to

14   investigate a case that's related to the intelligence

15:46:37  15   community.

16          And we believe that this investigation was many, many

17   years long, that there were lots of things that you do if it's

18   a sensitive investigation, lots of approvals.  You get to

19   travel overseas or talk to people overseas.  And at the time

15:46:54  20   we drafted these requests, we weren't sure what we were

21   actually going to get that could help us prove that.

22          And recall, these are the same requests that were

23   pending since last July, since a couple weeks after we were

24   appointed to the case.

15:47:06  25          So this is among the category of documents that we

27

15:47:10  1    believe will help us demonstrate that this is far from usual

2    and very suggestive of the involvement of high levels of

3    government and the intelligence community.

4          Is it the most direct proof of that?  It absolutely,

15:47:24  5    positively is not.  But at the time we drafted these requests,

6    and to a large part still today, we have very little

7    information with a government imprimatur that comes from them

8    that helps us combat their arguments that they've raised all

9    along, which is essentially Mr. Turi and Ms. Danneman and I

15:47:46 10    are reading too many books and too many movies about spies and

11    this is all made up and he had nothing to do with the

12    intelligence community.

13          So we believe that outsized attention focused on this

14    investigation strongly suggests that it involves intelligence

15:48:03 15    community.  We believe that's true.

16          In fact, some documents that we've recently gotten

17    tend to suggest that.  So we believe we're entitled to see

18    those documents.  What's the secret?  They're public moneys.

19    We're not asking to reveal work product.

15:48:17 20          I want to note explicitly we're not asking for work

21    product.  Never did.  We're not asking for attorney-client

22    privileged information to the extent any of that would ever

23    exist.  We're asking to see what a public agent and a public

24    agency did to investigate someone who's presumed innocent in a

15:48:36 25    very unusual case.  And, frankly, we do not understand the

28

15:48:39 1   objection to this.  If it's a wild goose chase, it's a wild

2   goose chase.  I don't think it is.

3           THE COURT:  Well, because it's a 16(a)(1)(E)(i)

4   request, you have to make a threshold showing --

15:48:57 5           MR. CABOU:  We believe --

6           THE COURT:  -- prima facie showing that the

7   government has information that would be helpful for the

8   defense.

9           MR. CABOU:  Your Honor, we'd be happy to brief this

15:49:06 10  specific issue.  The government never actually objected to

11  this until the matrix, even though it's been pending since

12  July.  The first time they actually addressed it --

13          MR. PIMSNER:  I do disagree with that --

14          THE COURT:  Hold on, Mr. Pimsner.

15:49:21 15          Well, so let's assume hypothetically that you were to

16  get this information and it shows 20 trips overseas related to

17  this case and half a million dollars spent, and now you're

18  standing in front of the jury.  What do you do with that?  How

19  do you know that's any different than what they spent on other

15:49:44 20  cases of this type?

21          I mean if this involves overseas events, which it

22  clearly does, how will the jury know that this isn't the cost

23  of doing business if you're going to prosecute people in these

24  kinds of arms-dealing cases?

15:50:00 25          MR. CABOU:  Your Honor, what I would say is standing

29

15:50:01  1   right here right now I can't say what I would say to the jury

2   about documents I've never seen.

3            THE COURT:  I just gave you a hypothetical --

4            MR. CABOU:  Your Honor --

15:50:08  5            THE COURT:  What would you say about that

6   hypothetical set of facts?

7            MR. CABOU:  I would say -- I'm not trying to be coy,

8   Your Honor.  What I would say depends in part about what other

9   discovery we get and what narrative I can build from soup to

15:50:19 10  nuts, granular to thematic, about Mr. Turi's involvement with

11  the Central Intelligence Agency and about how the way in which

12  the government has expended resources on this case strongly

13  suggests this is not a simple case about two pieces of paper.

14           I think what I would say is that if this were a

15:50:36 15  simple case about two pieces of paper, you wouldn't, for

16  example, need to send people to interview or to brief the

17  United States ambassador to Qatar or the United States

18  ambassador to the United Arab Emirates.

19           THE COURT:  Do you have reason to think they have

15:50:55 20  documents reflecting that consistent with your threshold

21  showing that you're required to make?

22           MR. CABOU:  Yes, Your Honor.  Interestingly, although

23  we had long ago requested documents relating to the

24  investigation and long ago been told that the government had

15:51:11 25  no information relevant to our public authority defense, among

15:51:14  1    the documents disclosed this past week, so in the immediate

         2    foreground of this hearing, were a few reports of

         3    investigation that we actually brought and would like to share

         4    with the Court and counsel to demonstrate exactly what we're

15:51:29  5    talking about.

         6            THE COURT:  You can describe it, that's okay.

         7            MR. CABOU:  So the document I'm holding here and that

         8    I'm handing to Mr. Pimsner is a report of investigation dated

         9    August 29th, 2011.  It is entitled Turi Defense Group.  The

15:51:47 10    topic is Embassy Brief of Turi Investigation.  And it states

        11    that this report of investigation documents briefing of the

        12    Turi investigation with the U.S. embassies in Qatar and the

        13    United Arab Emirates.

        14            This report goes on to describe that on August 16th,

15:52:11 15    2011, Supervisory Special Agent Bruce Swartley,

        16    S-W-A-R-T-L-E-Y, acting ICE attaché Abu Dhabi, briefed Michael

        17    Corbin, United States ambassador to the United Arab Emirates,

        18    as well as Victor Hurtado, the Deputy Chief of Mission.

        19            It goes on to state, and I'm reading from Bates page

15:52:34 20    6394, that both parties, the ambassador and Deputy Chief of

        21    Mission, requested to be briefed on how the case progressed

        22    prior to authorizing or declining a blue lantern check in the

        23    country.

        24            And the document goes on to say that in addition to

15:52:51 25    the aforementioned, deconfliction briefings were conducted

15:52:58  1    with the U.S. defense and intelligence personnel stationed

2    within the embassy.  The report goes on to say that the next

3    day that same supervisory special agent Swartley, quote,

4    briefed the U.S. *charge d'affaires*, open paren, acting

15:53:13  5    ambassador, close paren, of the U.S.  Embassy, Doha, Qatar.

6         There is then a report in the same disclosure that we

7    got this week on a report from January 2nd, 2012, also

8    entitled Turi Defense Group, and that report states that on

9    December 8, 2011, the ICE attaché Abu Dhabi met with the U.S.

15:53:45  10   Ambassador Corbin and Deputy Chief of Mission Hurtado once

11   again, and it goes on to say it was further stated the

12   response from the U.S. Embassy Doha would be combined

13   requesting further concurrence as well from DOS, which we

14   believe is Department of State, headquarters.

15:54:05  15        There is a subsequent follow-up report on January

16   21st, 2013, which I won't bother reading from, and what

17   appears to be the final report from the overseas officers is

18   dated March 15, 2015.  So just a few weeks ago and a few weeks

19   after our hearing.

15:54:24  20        Many of these reports have existed for three or four

21   years and we got them this week.

22        So these are strongly supportive of the fact there's

23   more to this than meets the eye.  The U.S. ambassador in two

24   different countries and *charge d'affaires* are not folks who

15:54:42  25   have a lot of time on their hands, and my guess is they're not

15:54:46  1   briefed on every single investigation that goes on related to

2   their countries.

3          Aside from the fact that we are puzzled and troubled

4   that we're just getting this now, to answer Your Honor's

15:54:57  5   question directly, it's things like this that, combined with

6   things like we're asking for regarding receipts which are in

7   Category -- I forget -- 5?

8          THE COURT:  6.

9          MR. CABOU:  6.  I'm sorry.  Things like this combined

15:55:10  10  with Category 6 could absolutely help tie together the

11  narrative that it's no secret we're seeking to build.

12         MR. PIMSNER:  First of all, the way the case is

13  categorized by Mr. Cabou, the government strongly disagrees

14  with.

15:55:27  15         The investigation started out, the agents learned

16  that Mr. Turi was attempting to put together a $275 million

17  arms deal that had been denied to Libya by the State

18  Department, and all efforts of the investigation were done in

19  order to prevent that from actually -- the transaction from

15:55:47  20  actually occurring, including a decision to go overt with the

21  investigation when it appeared the covert investigation would

22  not be able to stop it because all the activity was happening

23  overseas.

24         This isn't about what the ultimate charges were,

15:56:02  25  which were the lying to the State Department.  This was about

15:56:06   1   an ongoing attempt by Mr. Turi to illegally supply $276

2   million of arms to a rebel group that the State Department has

3   denied giving him authority to do.  It's much bigger than two

4   pieces of paper, as Mr. Cabou would like to categorize this.

15:56:29   5           Secondly, these reports that we've received, frankly

6   we just learned of their existence.  Apparently the agents may

7   have sent out leads to the various components, and it's not

8   unusual for any case that involves a specific overseas country

9   that the people in the embassy are going to be briefed on the

15:56:51  10   nature of the investigation, and it was -- the briefing was

11   done by the person located in country, the attaché, the ICE

12   attaché.  This isn't where the agent's running around the

13   world, you know, giving lectures on his investigation.

14           Getting back to the costs of the investigation,

15:57:13  15   Mr. Cabou has, through all the ROIs, all the interviews that

16   were conducted by the agent, including the location they were

17   conducted by, if that's somehow relevant.

18           We don't -- we submit that any documents relating to

19   actual costs are not relevant, not material to defense, and

15:57:35  20   are not authorized pursuant to Rule 16(a)(2), which explicitly

21   says internal government documents made by an attorney or

22   agents in investigating or prosecuting a case are not covered

23   by Rule 16.

24           So with that in mind, we don't believe the defense

15:57:57  25   has made a showing, other than the fact that there were

15:58:00  1   briefings done in other countries.  Does not necessarily mean

2   that that was out of the ordinary.  But once we learned these

3   reports existed, we immediately disclosed them within a day of

4   our receipt.

15:58:16  5        THE COURT:  All right.  Thank you.

6        With respect to Category 6, I'm not persuaded that

7   documents related to costs of investigation, which is the

8   subject, are material to preparing the defense of this case.

9        It may be, Mr. Cabou and Ms. Danneman, that the

15:58:37  10  argument you make at trial about the effort the government

11  undertook in this case could in some way be helpful, but it

12  seems to me you've got the documents that you just described,

13  you've got all of the interviews to talk about the extent of

14  the investigation.  But to how much it costs, this really

15:58:56  15  focuses on the cost of investigation, I can't conclude at this

16  point that that is material to the defense, and so I'm not

17  going to order the government to produce this.  But I'm not

18  going to go close the door on it either.

19        As you get more information, as you think in the

15:59:11  20  months ahead that the cost of the investigation somehow

21  becomes particularly helpful -- I shouldn't say

22  "particularly."  Becomes helpful to you in ways you haven't

23  described today, you can certainly raise it again.

24        We've already talked about Category 7 of the matrix.

15:59:36  25        You've indicated Category 8 is not at issue.

35

15:59:40  1          Category 9 is not at issue.

2          Let's talk about Category 10.

3          My understanding from reading the matrix is that this

4  concerns subpoenas the government served in connection with

15:59:58  5  the grand jury but in response to which it received no

6  documents.  Is that what you're after, Mr. Cabou?

7          MR. CABOU:  Well, Your Honor, we're after the

8  subpoenas that they served, whether they received responsive

9  documents or not.

16:00:20 10          THE COURT:  So you want the subpoena that says

11  "produce the following"?

12          MR. CABOU:  Yes, Your Honor.  And the subpoenas that

13  would indicate the custodians of record to whom those were

14  served.

16:00:30 15          THE COURT:  All right.  What is the authority for

16  requiring production of this information?

17          MR. CABOU:  Your Honor, they're relevant to the

18  development of a possible defense.  Namely, this is part of

19  our belief that the government has spent an unusual amount of

16:00:43 20  effort on this case, and I won't belabor the point.  I think

21  it's fair to say based upon Your Honor's ruling on the prior

22  category that Your Honor would not be persuaded by anything I

23  could muster on this one, so we're prepared to cut to the

24  chase on that one as long as Your Honor would entertain a

16:01:00 25  written motion on that subject if we develop more information

16:01:05  1    that it might be within the materiality standard as Your Honor

2    has articulated.

3              THE COURT:  So there is a 16(a)(1)(E)(i) request as

4    well?

16:01:13  5              MR. CABOU:  Yes, Your Honor.

6              THE COURT:  Okay.

7              My conclusion on that will be the same as it was with

8    respect to Category 6.  If you do decide it's relevant, raise

9    it again.

16:01:24 10              You mentioned, though, filing a motion.  What I would

11    ask you to do, on both sides, if issues come up that you think

12    I need to rule on, get together on the phone and call me.  And

13    I might be able to give you a ruling then.  If I can't, we'll

14    set a fairly focused briefing schedule just to address the

16:01:40 15    essential issues.  I would rather do that than just have

16    motion, response, reply, which stretches out over weeks.

17              We've addressed Category 11.

18              And it appears to me Category 12 doesn't call for me

19    to do anything.  You're simply saying, Mr. Cabou, you want

16:02:07 20    them to honor their *Brady* and *Jencks* obligations and preserve

21    *Brady* and *Jencks* material; right?

22              MR. CABOU:  That's correct, Your Honor.

23              THE COURT:  They clearly have an obligation to do it

24    and they said in the matrix they intend to comply with that

16:02:22 25    obligation.

37

16:02:25  1          So to summarize, I will hold off on any ruling on

2      Categories 1 and 2 until I see the Section 3 motion that's

3      being brought out next week.

4          I have provided a deadline of May 29th for the

16:02:42  5      government to produce the documents called for in Item 7 and

6      Item 11.

7          Are there any other matters we need to address

8      regarding the matrix?

9          MR. PIMSNER:  Your Honor, I think we need to address

16:02:59 10      the *U.S. v Cadet* issue.

11          THE COURT:  Where is that?

12          MR. PIMSNER:  It's actually top of page 13.  We have

13      responded in a footnote.

14          THE COURT:  13 wasn't in the matrix --

16:03:14 15          MR. PIMSNER:  No, it wasn't --

16          THE COURT:  -- so I didn't even bother to read

17      these -- I skimmed them, but if it wasn't in the matrix I

18      assumed there wasn't a dispute.  What's the issue?

19          MR. PIMSNER:  Only issue is they're asking for us to

16:03:27 20      provide witness names and addresses we don't intend to call,

21      which could be some entirely nebulous amount.  We propose at

22      the appropriate time we'll provide them a witness list of who

23      we intend to call, but we're not going to be providing any

24      type of sensitive personal information to the defense.

16:03:48 25          If they have specific requests of people that we can

16:03:52    1    attempt to help locate, we'll be glad to do that.  But to come

2    up with -- what he wants is a list of all non-witnesses, I

3    think is extraordinary.  And, now, the Court did order that in

4    the *Cadet* case, but that was reviewed as -- the Court found it

16:04:14    5    was an abuse of discretion for the Court to order that.  It's

6    not a finding that he is entitled to a list of non-witnesses

7    and plus it's problematic because as far as non-witnesses

8    could be a lot of people that were at these meetings that the

9    defendant attended that we do not have their identities.  I

16:04:34   10    mean, so, we can provide a witness list prior to trial that

11    will identify who we intend to call, and any other person the

12    defendant may request assistance on locating, we can do that.

13              THE COURT:  Mr. Cabou.

14              MR. CABOU:  Okay.  There's no dispute here.

16:04:53   15              THE COURT:  Okay.  All right.

16              Okay.  The other item I had on my list we've already

17    addressed, which is the Section 3 motion that I will be

18    receiving next week.  As I indicated, I will do my best to

19    rule on that and get an order out next week.

16:05:16   20              The scheduling order has dates that have -- that are

21    shortly upon us, such as expert disclosures.  I guess those

22    are the most immediate matters.  I'm assuming the schedule

23    remains in place.  Are there any issues we need to address

24    regarding it?

16:05:42   25              MR. PIMSNER:  None from the government.

16:05:44   1          MR. CABOU:  Your Honor, this is perhaps our broadest

2     issue of concern at the hearing.  We don't have any problem

3     with the government's May 4th expert deadline, which is the

4     next deadline, but we are gravely concerned about our ability

16:05:57   5     to identify and vet and propose and disclose our responsive

6     experts, in part because of classification issues we brought

7     before the Court.  In part because of the government's delayed

8     disclosure of things we've been asking for for a very long

9     time, and we would -- we want to be candid with the Court that

16:06:20  10     we want this case to go to trial on the schedule provided.

11     But we cannot say that we won't ask for a continuance of some

12     of the defense deadlines if we're not in a position to make

13     informed, knowing decisions about what's being asked of us at

14     that time.  Our gravest concern right now is our responsive

16:06:39  15     expert deadline, which I can't think of how we can make an

16     informed choice about that at this time.

17          THE COURT:  So are you asking me to rule on something

18     at this point, Mr. Cabou?

19          MR. CABOU:  I'm not, Your Honor.  I'm simply

16:06:52  20     providing notice to the Court that at some time we're likely

21     to ask the Court to at least continue our deadlines to

22     disclose for now the experts, and I'm giving as early warning

23     as possible, as has been our custom throughout the case, there

24     may be a problem and we don't want the Court or the government

16:07:08  25     to be surprised by it.

16:07:09  1          THE COURT:  Okay.  If you make that request, I will

       2  certainly rule on it.

       3          MR. CABOU:  Thank you, Your Honor.

       4          THE COURT:  Do we have other matters we need to

16:07:16  5  address today from either side?

       6          MR. PIMSNER:  Not from the government, Your Honor.

       7          THE COURT:  Anything else, Mr. Cabou or Ms. Danneman?

       8          MR. CABOU:  Not at this time, Your Honor.

       9          THE COURT:  Okay.

16:07:29 10          The matters that I've addressed will be reflected in

      11  the minute entry.  I won't be entering any separate order but

      12  they'll be in the minute entry.  Thanks very much.

      13          MR. CABOU:  Thank you, Your Honor.

      14          MR. PIMSNER:  Thank you, Your Honor.

16:07:42 15      (End of transcript.)

      16                      *  *  *  *  *

      17

      18

      19

      20

      21

      22

      23

      24

      25

1              **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 30th day of March,

15   2016.

16

17

18

19

20                         s/ Patricia Lyons, RMR, CRR
                           Official Court Reporter
21

22

23

24

25